

## IN THE CIRCUIT COURT OF CRAWFORD COUNTY, ARKANSAS
### CIVIL DIVISION

CHARLES B. DYER, JR. and
EDWARDS TITLE, LLC.　　　　　　　　　　　　　　　　　PLAINTIFFS

17CV-14-281

VS　　　　　　　　CASE NO.

STEWART TITLE GUARANTY COMPANY　　　　　　　　DEFENDANT

### COMPLAINT

COMES NOW the Plaintiffs, Charles B. Dyer, Jr., and Edwards Title, LLC, (hereinafter referred to as "Plaintiffs" or "Dyer") by and through their attorney, Joseph C. Self, and for their Complaint against Stewart Title Guaranty Company, (hereinafter referred to as "STG" or "Defendant"), states as follows:

### FACTS

1. Plaintiff, Charles B. Dyer, Jr., is a citizen and resident of Crawford County, Arkansas, and was at all times pertinent to this action. Edwards Title LLC is a single member LLC formed in 2009, and operating in Crawford County, Arkansas. Stewart Title Guaranty Company is a title insurance company authorized by the State of Arkansas authorized to do business in the state. This court has jurisdiction over the parties and the subject matter herein.

17CV-14-281　　171-17100009829-014
CHARLES DYER JR ETAL V STEW　20 Pages
CRAWFORD CO　　09/25/2014 08:08 AM
CIRCUIT COURT　　　　　　CC05S

2.      On or about December 8, 2008, Plaintiffs entered into an underwriting agreement with Defendant. (A copy of that Agreement is attached hereto as Exhibit A to this Complaint). The underwriting agreement remained in effect until September 26, 2011, at which time Defendant terminated the contract with Plaintiffs.

3.      Pursuant to the contract Plaintiffs had with Defendant, Plaintiffs sold policies of title insurance to persons and entities that were purchasing real property in Crawford County, Arkansas and surrounding areas. Pursuant to its contract, Defendant performed audits of Plaintiffs' business practices each year, and gave direction as to how Plaintiffs could improve their performance for Defendant pursuant to this contract.

4.      On October 13, 2010, Dyer was in an automobile accident that required him to undergo multiple surgeries and remain in the hospital for an extended period of time. As a result, the reconciliations for Plaintiffs' escrow accounts were done in December, 2010, for the months of September, October and November.

5.      While recovering from his injuries, Dyer learned that his father was diagnosed with pancreatic cancer. His father's condition was pronounced terminal following exploratory surgery in early January, 2011.

6.      In mid-February, 2011, Dyer received a call regarding an unpaid mortgage. Following a brief investigation, an employee named Susan Hudson admitted that she had not paid the payoff for a closing. The amount of the mortgage payoff that was not made was $165,265.71. Hudson was fired the morning of February 18, 2011, and provided

little information as to what had happened to cause that payoff not to be made.

7. On February 18, 2011, the mortgage referenced in the previous paragraph was paid off from the escrow account. A more intensive investigation took place, and on March 29, 2011, Dyer obtained a loan in the amount of $185,000 to put into the escrow account to cover the previous payoff and potentially other matters that Hudson had not paid.

8. On April 24, 2011, Dyer's father passed away after an extended hospital stay, and as a result, Dyer was out of the office frequently during the first half of 2011. Dyer reconciled his escrow account for the months of May, June and July in August, 2011. Plaintiffs were audited by Old Republic Title, another company with which Plaintiffs had a contract for underwriting title insurance, and passed the audit by Old Republic.

9. The theft from Plaintiffs' escrow account did not result in a financial loss for any other person or entity other than Plaintiffs. Because no claims were being made against Defendant, Plaintiffs did not believe it necessary to notify Defendant of the theft. However, on September 19, 2011, Dyer met with Kim Majors, a representative of Defendant, and advised her of the employee theft. On September 20, 2011, Majors was told to terminate Plaintiffs because her boss, Patrick Beall, believed Dyer was "in on it", and had used the time between when the theft was discovered and the time it was reported to Defendant to "cover his tracks". This was not true. This decision to terminate was not

communicated to Plaintiffs until September 26, 2011, when Plaintiffs received a written letter of termination from STG.

10. Plaintiff subsequently learned that the official reason for termination given to the Department of Insurance (hereinafter referred to as "DOI"), on September 26, 2011, was that Plaintiffs did not notify underwriter of the theft, nor did they notify the DOI of the theft, and there were shortages in the escrow account and delays in reconciliations. A copy of the Agency Appointment Termination Request is attached hereto as Exhibit B.

11. The termination letter from STG to Plaintiffs, Exhibit C, made reference to the Title Insurance Underwriting Agreement, Section 7(D) and H. Section 7(D) says, "Any notice or information of any act by company of apparent fraud or dishonesty, or of any shortage in company's escrow account, or the refusal of company to allow underwriter to perform an audit as set forth in Section 3(e) above."

Section 7(H) says, "Any determination by underwriter, in its sole discretion, that company and/or its principals were pursuing a course of conduct not in keeping with sound title insurance business practices, or posses a credit rating which contains negative entries, or upon discovery that the company or its principals have furnished any misleading or false information to underwriters or company." STG did not specify which of these allegations in Section 7(D) and 7(H) it thought applied to Plaintiffs, but in fact, none of them did.

12. STG provided the DOI with a copy of its September 26, 2011 letter, which made reference to the alleged violations recited above. In doing so, STG represented to DOI that Plaintiffs were in some way involved in a fraud or dishonesty, or had otherwise breached its contract with STG, which was not true.

13. By its own conduct, conversations, and filings made with the DOI, Defendant represented to the DOI that Dyer was in some way culpable in the theft of money from his agency, and that he had served to cover up the theft.

14. As a result of the actions of Defendant, DOI conducted an investigation of Plaintiff. At an administrative hearing, DOI called four (4) witnesses, one of which was the aforementioned Kim Majors from STG, and Lynn Wilburn was called as an expert witness. It was developed at the administrative law hearing that the top four clients for Mr. Wilburn were STG, or its affiliates. Further, DOI presented spreadsheets alleging to show Plaintiffs' misconduct which was generated from information which was provided to DOI by Defendant.

15. At the conclusion of the hearing, Plaintiffs' license to write title insurance was revoked, at least in part, for the following findings:

    1) Failure to comply with Rule 87 10(d) - an omission never noticed in the STG file audits;

    2) Failure to comply with Rule 87 10(e) - an omission never noticed in the STG audits;

    3)    Failure to comply with A.C.A. § 23-79-138(a) - an omission never noticed in the STG file audits;

    4)    Failure to comply with A.C.A. § 23-64-510 related to the appearance of Charles B. Dyer, Jr. d/b/a appearing as the agent on commitments and policies produced by the Plaintiff and entirely the fault of STG. Correspondence clearly indicated that Plaintiff had attempted to have STG change this for over two (2) years;

    5)    Failure to comply with A.C.A. § 23-103-413(2) regarding the statutory notice to purchasers, not because the notice wasn't given, but because it was given in the wrong place in the commitment at the direction of STG;

    6)    Failure to timely report and remit for policies issued even though STG never once raised this issue with Plaintiff, and in fact reported in audits that both were timely.

16.    As a result of the revocation order issued by DOI, Plaintiff has been unable to work in the title insurance industry since November 11, 2012. Prior to that time, Plaintiff had owned and operated a title company, under one name or another, since January 2, 1989.

## BREACH OF CONTRACT

17.    Paragraphs 1 through 16 of this Complaint are hereby realleged in their

entirety as if set out herein word for word.

18.     As set forth above, Plaintiffs and Defendant entered into a Title Insurance Underwriting Agreement on December 8, 2008. Implied in this contract, as in all others in the State of Arkansas, is a duty of good faith and fair dealing.

19.     Paragraph # 6 of the Agreement stated that the Agreement was terminable without cause by either company or underwriter at any time on sixty (60) days written notice. Neither party sought to terminate this Agreement pursuant to paragraph # 6.

20.     Defendant alleged paragraph 7(d) and 7(h) supported its decision to immediately terminate this Agreement. Defendant cited those sections before it had conducted a full and fair investigation, thus breaching its duty of good faith and fair dealing that it owed to Plaintiffs.

21.     In paragraph 7(d), there are three distinct acts of misfeasance or malfeasance that could result in immediate termination. Plaintiffs had not engaged in any apparent fraud or dishonesty. The shortage in the company's escrow account had been remedied by Plaintiff placing money in the escrow account in March, 2011, and at the time of termination, there was no shortage in Plaintiffs' escrow account. Plaintiffs never refused the underwriter to perform an audit as requited in the contract.

22.     Under Section 7(h), the determination that STG made that Plaintiffs were pursuing a course of conduct not in keeping in sound title insurance business practices had not been borne out by previous audits. The 2011 audit was conducted after the

conducted after the decision to terminate Plaintiffs had been made, but before it was communicated to Plaintiffs.

23. Any concerns that STG had that Plaintiffs had pursued a course of conduct not in keeping with sound title insurance business practices had been waived by STG through its continued relationship with Plaintiffs. Plaintiffs reasonably relied on the implicit representation that Plaintiffs were conducting their business in accordance with STG standards by the continued relationship following each audit. As such, STG should be estopped from claiming that Plaintiffs method of conducting business constituted a grounds for termination on September 26, 2011.

24. Section 7(h) continues that Plaintiffs should be immediately terminated if it possessed a credit rating that contained negative entries, and there has been no proof of that offered. Section 7(h) concludes that Plaintiffs can be terminated immediately upon discovery that the company, or its principals, have furnished any misleading or false information to STG, and that did not take place at any time, and certainly not before the September 26, 2011 termination.

25. As such, Defendant's immediate termination of Plaintiffs breached its duty of good faith and fair dealing, and damaged Plaintiffs as set forth below.

## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

26. Paragraphs 1 through 16 of this Complaint are hereby realleged in their entirety as if set out herein word for word.

27. Plaintiffs believe that STG tortiously interfered with Plaintiffs' business expectancy through its conduct and communications with DOI. STG knew Plaintiff had a relationship with DOI as a licensed title agent, and STG had a duty not to provide false and misleading information to DOI to interfere with said relationship Plaintiffs had with DOI. As a title insurance company authorized to do business in the State of Arkansas, STG knew of the relationship and business expectancy that Defendant had and through its intentional acts, interfered with that business expectancy to the point that Plaintiff was terminated as a title agent in the State of Arkansas. As a result of STG's intentional conduct, Plaintiffs have been damaged in the sum and amount of $750,000.00 as of this time, and Plaintiffs' damages continue. Plaintiffs have been damaged as set forth below.

## DAMAGES

28. As a result of STG breaching the contract between the parties in wrongfully terminating their agreement, and by STG tortioiusly interfering with Plaintiffs' business expectancy by providing false and misleading information to DOI, Plaintiffs have suffered damages to date in the sum and amount of SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($750,000.00). Further, these damages will continue until such time as this matter is tried, and Plaintiffs reserve the right to amend their claim for compensatory damages accordingly.

29. Further, STG knew, or should have known, in light of all the surrounding

circumstances that its conduct would naturally and probably result in damage to Plaintiffs, and it continued such conduct with malice, or in reckless disregard of the consequences from which malice can be inferred, such to entitle Plaintiffs to punitive damages in the sum and amount of SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($750,000.00).

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that they be awarded a judgment against Defendant in the amount of SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($750,000.00) in compensatory damages, SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($750,000.00) in punitive damages, for their costs and attorney fees, and for all other relief to which they may proved themselves to be entitled.

Respectfully submitted,

CHARLES BRYAN DYER, JR. and
EDWARDS TITLE, LLC.
Plaintiffs

By: *(signature)*
JOSEPH C. SELF
A.B.A. 82-145
423 Rogers Avenue, Suite 101
Fort Smith, AR 71901
Office: 479-785-5881
Fax:    479-785-5883
Email:  Selflawfirm@juno.com

and *(signature)*
CHARLES B. DYER, JR.
A.B.A. 89-140
P.O. Box 414
Van Buren, AR 72957

# TITLE INSURANCE UNDERWRITING AGREEMENT

## (Non-Exclusive Form)

THIS AGREEMENT entered into __8th____ day ___DECEMBER____, 2008, between STEWART TITLE GUARANTY COMPANY, a Texas Corporation (referred to herein as "UNDERWRITER"). __CHARLES B. DYER, JR. D/B/A EDWARDS ABSTRACT COMPANY__ referred to herein as "Company").

1. **TERRITORY:** COMPANY is a non-exclusive agent authorized to issue UNDERWRITER's title policies covering property in the State of ___ARKANSAS___ (hereinafter referred to as "Territory"), and in those areas within said state where UNDERWRITER does not now have, nor in the future acquires, an exclusive title insurance representative. COMPANY shall not issue UNDERWRITER's title policies on property located outside of said Territory.

2. **DUTIES OF UNDERWRITER:**

    (a) UNDERWRITER shall furnish to COMPANY all regularly issued title policy, binder, commitment, and endorsement forms necessary for the issuance of title insurance.

    (b) UNDERWRITER shall maintain a capacity for the research of matters pertaining to title insurance risks and shall remain active in the various trade associations relating to title insurance. In this regard UNDERWRITER shall:

    (1) Furnish COMPANY from time to time with rules and instructions involving matters of importance to the business of title insurance.

    (2) Promptly determine questions submitted by COMPANY regarding the issuance of title policies.

    (c) UNDERWRITER shall pay premium and other similar taxes on the actual cash (gross premium [risk rate]) charged for and remitted to UNDERWRITER by COMPANY. pursuant to paragraph 11 hereof. Except that UNDERWRITER shall deduct therefore the cost of any reinsurance or coinsurance purchased by UNDERWRITER, and UNDERWRITER shall not be liable for any other taxes of any kind due on income derived by COMPANY. Should UNDERWRITER be required to pay premium tax on any amount greater than that specified above, COMPANY agrees to reimburse UNDERWRITER for such additional tax.

    (d) UNDERWRITER shall defend at its own expense all actions and pay all losses under its title policies except as herein otherwise provided subject to the right of reimbursement in paragraph 5 hereof. UNDERWRITER does not have any obligation to defend COMPANY in any action filed against COMPANY for COMPANY's malfeasance or negligence, even though COMPANY may have issued UNDERWRITER's title policy.

    (e) UNDERWRITER shall furnish its usual form of insured closing letter to each of COMPANY's customers that requests such a letter.

3. **DUTIES OF COMPANY:**

    (a) COMPANY shall conduct its business in a sound and ethical manner and shall issue title policies according to recognized underwriting practices, the rules and instructions given by UNDERWRITER, and those rules and instructions imposed by the Department of Insurance or other regulatory body.

    (b) All title policies must be based on a written report of title resulting from a complete search and examination of those public records, surveys, and inspections relevant to the insurance afforded by such policies. Where outside attorneys are used for examination, they shall act for and be paid by COMPANY but shall be approved by UNDERWRITER. Each title policy shall be on a form designated by UNDERWRITER and shall correctly reflect the status of title as of

2006 Non-Exclusive Agreement
Revised April 13, 2006


EXHIBIT A

the date and time of said policy with appropriate exceptions as to liens, defects, encumbrances, and/or objections disclosed by the search and examination of title or known by COMPANY to exist.

(c) For each title policy issued, COMPANY shall preserve in a separate file all documents supporting the search, examination, and report of title on which the title policy is based. UNDERWRITER shall have the right to make copies of all said title reports and documents at any time within ten (10) years after termination of this Agreement.

(d) No later than the fifteenth (15th) day of each month, COMPANY shall send to UNDERWRITER a register which shall consist of the following:

 (1) A numerical list of all policies issued or charged for or voided during the previous month.

 (2) A copy of each policy issued or charged for during the previous month and the original of each policy voided.

 (3) A check for the gross premiums charged for the account of UNDERWRITER for the previous month.

(e) COMPANY agrees to keep safely in its escrow account, separate from COMPANY's individual accounts, all funds received by COMPANY from any source(s) in connection with transactions in which UNDERWRITER title policies will be issued, and to disburse said funds only for the purpose for which they were entrusted. Said account shall be designated "____CHARLES B. DYER, JR. D/B/A  EDWARDS ABSTRACT COMPANY__ Escrow Account" COMPANY agrees to reconcile said escrow account each month within thirty (30) days of the date of the bank statement. UNDERWRITER may at any time make, but shall have no obligation to make, an audit of said escrow account and the general books of accounts and of all accounts, checks, records, or files of COMPANY pertaining to transactions in which UNDERWRITER's title policies are or will be issued.

(f) COMPANY agrees to keep in force, at COMPANY's expense, a __TWO-HUNDRED FIFTY THOUSAND__ ($ 250,000.00) minimum amount Title Agent Errors and Omissions Policy with opinions coverage and a deductible provision of no more than ____FIVE-THOUSAND____ ($ 5,000.00 .00) per loss, and a Fidelity Bond of ____N/A____ ($ N/A .00), each payable so as to protect UNDERWRITER as well as COMPANY. In the event COMPANY has in force an Errors and Omissions Policy and/or a Fidelity Bond, COMPANY hereby assigns to UNDERWRITER all of its rights, claims, and causes of action that accrue thereunder. A copy of the Policy and Bond shall be furnished to UNDERWRITER.

(g) Prior to the issuance of a binder, commitment, or title policy in excess of UNDERWRITER's single policy retention limit, as determined by UNDERWRITER from year to year, or if a customer requests reinsurance at any level, COMPANY shall immediately obtain UNDERWRITER's consent and send a copy immediately to the Reinsurance Department of UNDERWRITER in order that UNDERWRITER may contract for such reinsurance as it deems necessary. UNDERWRITER will pay the percentage of the reinsurance cost equal to the percentage remitted to it by COMPANY pursuant to paragraph 11 hereof, and the balance of the reinsurance costs will be paid by COMPANY. COMPANY shall obtain UNDERWRITER's consent as specified in paragraph 4b.

(h) In the event a claim is made under a title policy, COMPANY shall give immediate notice thereof to UNDERWRITER and furnish to UNDERWRITER a Claim Report Form, a copy of the title policy involved, and all documents and information available relating to the claim. COMPANY shall conduct all investigations requested by UNDERWRITER and shall cooperate with UNDERWRITER in the defense or settlement of the claim, whether such claim be made before or after the termination of this Agreement.

(i) COMPANY shall furnish UNDERWRITER with a copy of any audit or report that COMPANY is required to make to the Department of Insurance (or similar regulatory body) and a copy of those reports of operations and financial status as stockholders and directors of the COMPANY are permitted by law to see.

(j) COMPANY authorizes UNDERWRITER to verify and exchange information regarding COMPANY and/or its principals and any current or subsequent contractual agreement including, but not limited to, requesting investigative

2

consumer reports, records of criminal convictions, credit reports, and/or consumer report information at any time. Further, COMPANY and/or its principals understand that upon reasonable written request they may obtain additional information about such reports under the Fair Credit Reporting Act. COMPANY shall provide UNDERWRITER with a list of COMPANY's ten (10) largest customers as well as any entity in which COMPANY or its principals may have the ability to direct such entity's activities.

(k) COMPANY agrees that COMPANY will adhere to UNDERWRITER'S guidelines regarding the privacy protection of nonpublic personal information relating to consumers and customers as outlined in UNDERWRITER'S bulletins and other writings as circulated from time to time. COMPANY is not authorized to share nonpublic personal information that COMPANY collects on UNDERWRITER'S behalf with any other persons, except as expressly authorized in writing by the UNDERWRITER'S guidelines.

(l) Company shall indemnify, protect, save, defend and hold Underwriter harmless from any unauthorized use of the forms, materials and manuals, of whatever nature, supplied by Underwriter to Company, whether such forms, materials and manuals are produced electronically, preprinted or otherwise.

4. **COMPANY'S AUTHORITY AND LIMITATIONS THEREON:**

   (a) COMPANY is authorized to issue title insurance on forms furnished by UNDERWRITER subject to the provisions of this paragraph, but COMPANY shall not alter forms without the prior written consent of UNDERWRITER.

   (b) No title policy shall be issued by COMPANY in excess of One Million Dollars ($1,000,000.00) without first obtaining the prior written consent of UNDERWRITER.

   (c) COMPANY's Board of Directors shall approve in writing the names of its employees given authority to countersign UNDERWRITER's title policies, and shall provide UNDERWRITER a list of said authorized employees.

   (d) COMPANY shall not without UNDERWRITER's prior written consent settle, compromise, or negotiate any claim under a title policy of UNDERWRITER, or employ counsel for UNDERWRITER or an insured in regard to a claim, or accept service of process on behalf of UNDERWRITER.

   (e) COMPANY shall not without UNDERWRITER's prior written consent insure over a title defect, lien, or encumbrance, regardless of any indemnity or deposit that COMPANY shall obtain.

   (f) COMPANY is expressly not appointed as an agent of UNDERWRITER for purposes of providing abstracting and/or escrow services, and UNDERWRITER shall have no liability or responsibility for any claims or losses due to COMPANY acting as principal in providing such abstracting and/or escrow services.

   (g) COMPANY is expressly not appointed by UNDERWRITER as its agent for receipt of service of process, a notice of claim and/or complaint. In the event COMPANY receives said service of process, a notice of claim and/or complaint, COMPANY shall immediately inform the person or entity giving said service of process, notice of claim and/or complaint that COMPANY is not the agent of UNDERWRITER for the purpose of service of process, receipt of notice of claim, or receipt of complaint. COMPANY shall immediately inform the insured to file its claim directly with the UNDERWRITER as required by the policy and inform the UNDERWRITER of the attempt to deliver service of process, notice of claim and/or complaint.

5. **DIVISION OF LOSS AND LOSS EXPENSE:** The term "Loss" shall include the amount paid to or for the benefit of the insured as well as loss adjustment expense including any cost of defending the claim resulting in the loss.

3

(a) On each loss under a title policy issued pursuant to this Agreement not due to COMPANY's negligence or fraud, COMPANY shall be liable to UNDERWRITER for the first Two Thousand Five Hundred Dollars ($2,500.00) of such loss.

(b) On each such loss due to the fraud or intentional act or omission of COMPANY or its employees, representatives, or agents, or due to the negligence thereof, COMPANY shall be liable to UNDERWRITER for the entire amount of such loss including, but not limited to, attorneys' fees, litigation expenses, and costs of settlement negotiations. Such losses include but are not limited to:

   (1) Failure of title plant to disclose matters causing losses.
   (2) Failure to discover or report any instrument of record affecting title.
   (3) Violations of escrow instructions.
   (4) Failure to follow underwriting guidelines and/or instructions of UNDERWRITER.
   (5) Failure to prepare a title policy which shows defects and matters affecting title disclosed in the title search or which should have been disclosed in the title search.

(c) On each loss suffered by UNDERWRITER by reason of its Insured Closing Letter issued pursuant to paragraph 2e of this Agreement, COMPANY shall be liable to UNDERWRITER for the entire amount of such loss including, but not limited to, attorney fees, litigation expenses, and costs of settlement negotiation.

(d) On each loss in which COMPANY is liable to UNDERWRITER under this Section 5, COMPANY hereby grants to UNDERWRITER a lien on all the assets of COMPANY until all sums owing hereunder are paid.

6. **TERMINATION OF AGREEMENT:** This Agreement is terminable without cause by either COMPANY or UNDERWRITER at any time on sixty (60) days written notice.

7. **TERMINATION UPON DEFAULT, ETC.:** In addition to other termination provisions contained in this Agreement, UNDERWRITER may immediately terminate this Agreement at any time by written notice to COMPANY upon the happening of any of the following:

(a) Any bankruptcy proceedings (voluntary or involuntary), insolvency, receivership, or any like proceedings involving the financial stability of COMPANY.

(b) Any Court or Administrative proceeding or decision against COMPANY for the violation of any federal or state law or the breach of any rule or regulation of the Department of Insurance or other regulatory agency.

(c) Any revocation, disqualification, suspension, or termination of COMPANY's right to do business or any license it may have as a title insurance agency or abstracter.

(d) Any notice or information of any act by COMPANY of apparent fraud or dishonesty, or of any shortage in COMPANY's escrow account, or the refusal of COMPANY to allow UNDERWRITER to perform an audit as set out in Section 3e above.

(e) Any failure of COMPANY to keep proper accounting records of its escrow accounts or any failure to reconcile same within thirty (30) days of the date of the last bank statement.

(f) Any failure, refusal, or neglect by COMPANY to pay any remittances due to UNDERWRITER within twenty (20) days after written notice from UNDERWRITER to COMPANY of a deficiency.

(g) Any failure, refusal, or neglect to cure any default by COMPANY within thirty (30) days after written notice from UNDERWRITER to COMPANY concerning such default.

4

(h) Any determination by UNDERWRITER, in its sole discretion, that COMPANY and/or its principals are pursuing a course of conduct not in keeping with sound title insurance business practices, or possess a credit rating which contains negative entries, or upon discovery that COMPANY or its principals have furnished any misleading or false information to UNDERWRITER or COMPANY.

8. RELATIONSHIP OF UNDERWRITER AND COMPANY SUBSEQUENT TO TERMINATION: Subsequent to termination or cancellation of this Agreement under any provisions of this Agreement:

   (a) COMPANY shall cease and discontinue the issuance of title policies of UNDERWRITER; provided, however, that UNDERWRITER shall have the right to have its title policies issued on those title transactions in process.

   (b) COMPANY shall cease the use and/or display of the Stewart name or to hold itself out or to advertise itself as an issuing office of UNDERWRITER.

   (c) COMPANY shall return to UNDERWRITER all materials, forms, manuals, and supplies furnished COMPANY by UNDERWRITER.

   (d) COMPANY shall retain all evidence of insurability in its files for the benefit of both UNDERWRITER and COMPANY, and to comply with any governmental regulations or laws. UNDERWRITER shall have the right to copy any such files, which right shall survive the termination of this Agreement.

   (e) COMPANY shall continue to account to UNDERWRITER for all policies in accordance with the provisions of this Agreement.

9. ASSIGNMENT: This Agreement is binding on and inures to the benefit of any successor of UNDERWRITER whether by merger, consolidation, affiliation, or otherwise.

10. NOTICES: All notices provided for in this Agreement shall be given in writing to the party affected and shall be personally delivered to the other party or mailed to it by Certified or Registered United States Mail at the appropriate address shown below.

11. GROSS PREMIUMS – SCHEDULE OF PAYMENTS:

   (a) COMPANY may charge any fees it desires of whatever character for its services which do not impose an obligation on UNDERWRITER, including the search and examination of title (which are a necessary and integral part of underwriting) in transactions where title insurance is being issued, so long as same are permitted by law and not inconsistent with any rate filing or any rules and regulations of the Department of Insurance or other regulatory Agency. _____ percent ( 20 %) of the [ XX ] rate filing, [____] promulgated rate, [____] attached schedule of charges, [____] total customer charges (all fees charged the public), including all changes in or amendments to any of the above bracketed items, constitutes the gross premium (risk rate) to be charged for and remitted to UNDERWRITER by COMPANY. Provided that UNDERWRITER shall not receive less than thirty-five cents (.35) per $1,000 in policy liability, excluding simultaneous issue policies. The gross premium (risk rate) shall include Fifty Percent (50%) of all amounts charged for standard endorsements not described in paragraph 11b. In the event COMPANY, under this paragraph, pays UNDERWRITER according to an attached schedule of charges and COMPANY increases its charges to the public for title insurance, title examination, and escrow in conjunction with the issuance of a title policy, then the amount COMPANY shall pay to UNDERWRITER shall be increased by the same percentage. COMPANY agrees to promptly notify UNDERWRITER of any increase in charges to the public. All amounts constituting the gross premium (risk rate) are the property of UNDERWRITER, and shall be collected and held by COMPANY in trust for UNDERWRITER.

   (b) COMPANY shall promptly remit to UNDERWRITER as gross premium (risk rate) One Hundred Percent (100%) of all charges made by COMPANY for extra hazardous risks or coverage assumed by UNDERWRITER. Extra hazardous risks shall include, but are not limited to, zoning coverage, usury coverage, non-imputation coverage,

5

shared application endorsement, option endorsement, and tie-in endorsement. These endorsements are not to be issued without permission of Houston Legal Department or a Senior Underwriter.

(c) If loss and loss adjustment expenses (including attorney fees) incurred by UNDERWRITER in any one calendar year exceed Thirty Percent (30%) of the gross premium (risk rate) actually remitted to UNDERWRITER by COMPANY in that calendar year, then COMPANY'S remittance to UNDERWRITER for gross premium (risk rate) shall increase Ten Percent (10%) (One Hundred Ten Percent (110%) of the above remittance rate to UNDERWRITER) until UNDERWRITER has recouped all loss and loss adjustment expenses, including attorney fees, incurred in excess of said Thirty Percent (30%) of the gross premium (risk rate). This clause is cumulative.

(d) In the event COMPANY becomes delinquent in remitting UNDERWRITER's gross premium (risk rate) as determined by paragraph 11a above, COMPANY hereby grants to UNDERWRITER a lien against all the assets of the COMPANY until UNDERWRITER is fully paid.

IN WITNESS WHEREOF, COMPANY and UNDERWRITER have executed this Agreement as of the day and year first stated above.

UNDERWRITER:

STEWART TITLE GUARANTY COMPANY

P.O. BOX 2029

HOUSTON, TEXAS 77252

By: _____
     Senior Vice President

Attest: _____

COMPANY:

CHARLES B. DYER, JR. D/B/A
EDWARDS ABSTRACT COMPANY

1304 CHERRY STREET

VAN BUREN, AR 72957

By: _____
     Charles B. Dyer, Jr.

Attest: _____

6

2006 Non-Exclusive Agreement
Revised April 12, 2006

Form AID-LI-171 (10-07)



ARKANSAS INSURANCE DEPARTMENT
LICENSE DIVISION
1200 WEST THIRD STREET
LITTLE ROCK, AR 72201
PHONE: 501-371-2750
FAX: 501-683-2604
WEBSITE: www.insurance.arkansas.gov/license/divpage.htm

## AGENCY APPOINTMENT TERMINATION REQUEST

1. Company NAIC # __50121__

2. Company Name: __Stewart Title Guaranty Company__

3. Type of Appointment: Agency __X__   Agent of Agency_____

**To Cancel the Appointment for the entire agency:**
4a. Agency Tax ID Number: __AID #325319__

4b. Agency Name: __Edwards Title, LLC__

4c. Agency's Address: __1304 Cherry Street Suite B__   __Van Buren__   __AR__   __72956__
                                    Street                                       City              State      Zip

**To cancel an agent appointed under an agency:**
5a. Agency Tax ID Number: _____

5b. Agency Name: _____

5c. Agent's Social Security Number _____

5d. Agent's Full Legal Name: _____

5e. Agent's Address: _____
              Street                    City              State      Zip

5f. Reason for Termination of appointment: (at least one must be checked)
_____ Voluntary Termination by Agent/Agency   _____ Failed to Produce Business

Attach documentation if any of the following are checked:
_____ Rebating   _____ Twisting   _____ Conversion of Premium Monies

Other:
Agent notified ASM of employee theft from their escrow account which agent funded. The theft occurred earlier in 2011 and the agent did not notify STG nor the Arkansas Department of Insurance as required by statute. Audit revealed current shortage in escrow account and delays in reconciliation of the escrow account.

*I, the Undersigned authorize such cancellation and certify that the appointee has been notified of such cancellation in compliance to Arkansas Insurance Code:*

_Kim Majors_ (signature)                    __9/26/2011__
Authorized Signature                         Date

__Kim Majors__                               __(501) 228-8237__
Printed or Typed Name of Authorized Individual   Company Contact and Contact Phone number

Fees: All terminations are $10.00.



EXHIBIT B



James L. Gosdin
Chief Underwriting Counsel
Senior Vice President
Stewart Title Guaranty Company
1980 Post Oak Boulevard, Suite 710
Houston, TX 77056
(800) 729-1902 (Phone)
(713) 629-2248 (Fax)
jgosdin@stewart.com

September 26, 2011

Charles B. Dyer, Jr. DBA
Edwards Abstract Company
1304 Cherry Street, Suite B
Van Buren, AR 72957

```
Invoice:              Date : 26Sep11         Shipping :    7.39
Custom: 9998898915989 Weight : 0.1 LBS       Special :     1.15
Phone # :             COD :             0.00 Handling :    0.00
Dept: Stewart Legal S DV :              0.00 Total :       8.54
                      Svs: STANDARD OVERNIGHT
                      TRCK: 9725 1548 0476
```

Agent I.D. Number: 040034

Dear Charles Dyer:

    Pursuant to the terms of the Underwriting Agreement (the "Agreement") between Stewart Title Guaranty Company ("Underwriter") and Charles B. Dyer, Jr. DBA Edwards Abstract Company (the "Company"), Underwriter hereby gives notice of termination of said Agreement effective immediately for cause pursuant to Paragraph 7(d) and 7(h) of the Agreement.

    As a consequence of the termination, it will be necessary for you to report forthwith a list of all unused forms and outstanding title commitments, or block of policy numbers, if any, whether such forms are produced electronically, preprinted, or otherwise, if any, together with a current statement accounting for all premiums due Underwriter. The Stewart Agency Services Manager or other Stewart representative will arrange to obtain all Stewart supplies and policy forms. Company agrees to cease the use of Stewart policy forms both printed and electronic, electronic policy number blocks, electronic fonts, or any other means of electronically producing Stewart forms and policies.

    Please be advised that Underwriter continues to reserve all rights and remedies available to it pursuant to the Agreement, as well as those available by statute or common law principles. This termination letter is not intended to be an exclusive remedy or a waiver of any said rights or remedies. Accordingly, any pre-existing obligations of the Company or other provisions that apply after termination of the Agreement, including but not limited to any personal indemnifications, continuation of any errors and omissions coverage, safeguarding escrow accounts, claim notification and cooperation, privacy protection of non-public information, unauthorized use of forms, responsibility for claims or losses, retention of files and evidence of insurability thereof, and continuing duties to account shall survive the termination of the Agreement. Company shall also cooperate with any post-closing audit by Underwriter and the collection of policy inventory.

    Any questions concerning this action should be directed to our Stewart Title Agency Services Manager or representative, who will be happy to answer same.

Very truly yours,

Jim Gosdin
Senior Vice President and Chief Underwriting Counsel

JLG:/sj
xc:    Patrick Beall
       Kim Majors

EXHIBIT C